**UNITED STATES of America,**

v.

**Oreste ABBAMONTE, a/k/a "Ernie boy", Joseph Del Vecchio, a/k/a "Joe Crow", Guy A. Di Girolamo, Defendants.**

**Crim. No. N–83–47 (TFGD).**

United States District Court, D. Connecticut.

Oct. 8, 1985.

William A. Keefer, John H. Durham, Attys., U.S. Dept. of Justice, New Haven, Conn., Alan H. Nevas, U.S. Atty., for plaintiff.

Gerald L. Shargel, New York City, for Joseph DelVecchio.

Michael Joseph (Joseph & Stalonas), New York City, for Oreste Abbamonte.

John Nicholas Iannuzzi (Iannuzzi, Russo & Iannuzzi), New York City, for Guy A. DiGirolamo.

## RULING ON REMAND ON MOTIONS TO DISMISS INDICTMENT ON GROUNDS OF DOUBLE JEOPARDY

DALY, Chief Judge.

Defendants Oreste Abbamonte, Joseph DelVecchio and Guy Anthony DiGirolamo have each moved for dismissal of charges against them in this indictment on the ground of double jeopardy. The Court denied those motions on September 18, 1984. In its ruling in *United States v. Abbamonte, et al.,* 759 F.2d 1065 (2d Cir.1985) the United States Court of Appeals for the Second Circuit found that these defendants each made a sufficient showing to place on the prosecution the burden of showing that the conspiracy previously charged in an information filed in the Southern District of New York, in the case of Abbamonte and DelVecchio, and the conspiracy charged in a prior Connecticut indictment, in the case of DiGirolamo, were not part of the overall conspiracy charged in this indictment. 759 F.2d at 1070. In accordance with that ruling remanding the matter for further consideration by this Court, an evidentiary hearing was held on June 20, 1985. As set forth more fully below, the Court finds that the government has met its burden and the motions are denied.

Since Abbamonte and DelVecchio base their claims of double jeopardy on their prior convictions in the Southern District of New York and DiGirolamo bases his claim on a prior conviction in the District of Connecticut, the Court treats the claims separately, setting forth first its findings of fact with respect to Abbamonte and DelVecchio, and then its findings as to DiGirolamo.

## FINDINGS OF FACT

### A. *Pending Indictment*

Count one of this indictment ("pending indictment") charges defendants Abbamonte, DelVecchio and DiGirolamo with conspiring with each other and with Frank Santo Cotroni, Giovanni Marra, Michael Corcione, Nichola Bruna and "other persons unknown to the Grand Jury" to distribute heroin in violation of 21 U.S.C. § 846 (1982), between April 26, 1982 and May 28, 1982. The pending indictment charges that part of the conspiracy consisted of Marra and Cotroni, in Canada, arranging for the delivery of heroin to various persons in the New York City area, including Abbamonte and DelVecchio, for further distribution. The indictment alleges that in furtherance of the scheme described above, Cotroni and Marra used DiGirolamo, in Bridgeport, and Corcione as middlemen in the heroin transactions in the New York City area.[1]

Four overt acts are also alleged. The first two are international telephone calls between DiGirolamo and Cotroni. On April 27, 1982, Cotroni telephoned DiGirolamo concerning difficulty in obtaining heroin, and on May 9, 1982, Cotroni again called DiGirolamo with regard to a meeting between DiGirolamo and Corcione. The third overt act alleges a meeting, on May 10, 1982, at which DiGirolamo received a quantity of heroin from Corcione and met thereafter with Abbamonte in the vicinity of Shore Road, Port Washington, New York. The fourth overt act alleges the delivery by Corcione of U.S. currency to Cotroni and Marra in Canada.

### B. *Abbamonte and DelVecchio*

On January 7, 1983, in the United States District Court for the Southern District of New York, defendants Abbamonte and DelVecchio pleaded guilty to Count One of a superseding information ("the information") which alleged a conspiracy among

---

1. The pending indictment also includes three counts of substantive offenses of transporting over $5,000 in U.S. currency into Canada without filing a certain customs form in violation of

31 U.S.C. §§ 5316, 5322(b) and 18 U.S.C. § 2. These latter counts are not at issue in the instant motions.

Abbamonte, DelVecchio, Lorenzo DiChiara, Francisco Solimene, Rafail Gonzalez, Aleida Martinez, "and others unknown" to distribute heroin in violation of 21 U.S.C. § 846. This conspiracy was alleged to have existed from on or about April 1, 1982 through January 7, 1983. The information set forth sixteen overt acts. The first overt act was a meeting "in or about April, 1982" between Francisco Solimene and an undercover special agent of the Drug Enforcement Administration (DEA) at which they discussed the sale and distribution of heroin. The fifteen other overt acts all occurred inthe late summer and fall of 1982, beginning on or about September 9, 1982 with another meeting between Solimene and the undercover agent at which Solimene told the agent that he had a source of supply for heroin. Also on or about September 9, 1982, Solimene placed a telephone call to Lorenzo DiChiara who met with Solimene on September 14, 1982 and handed him a brown paper shopping bag. The fifth overt act alleges that DiChiara handed Solimene approximately three kilograms of heroin in the vicinty of 87th Street and Third Avenue, Bronx, New York. The information goes on to allege that on or about September 24, 1982, Aleida Martinez spoke by telephone with the undercover agent. Also on September 24, 1982, DiChiara met with Martinez and asked about the whereabouts of Solimene. On or about October 6, 1982, DiChiara met with the undercover agent and another individual to discuss money owed by Solimene and Solimene's whereabouts. Also on October 6, 1982, DiChiara spoke with Abbamonte about the money Solimene owed for heroin and Solimene's whereabouts.

The information further alleges as overt acts that on October 13, 1982, Abbamonte placed a telephone call to another individual; on October 14, 1982, Joseph DelVecchio met with another individual in the vicinity of 65th Street and Third Avenue in Manhattan, New York; on or about October 15, 1982, Abbamonte met with another individual and said in substance that he had heroin available in kilogram amounts; on Oc-

tober 18, 1982, Abbamonte met with the undercover agent and another individual at which time Abbamonte said he would sell heroin to the undercover agent for $180,-000 per kilogram; on October 20, 1982, in the vicinity of 61st Street and York Avenue, Abbamonte and DelVecchio sold to the undercover agent approximately three kilograms of approximately 80% pure heroin; on October 28, 1982, Abbamonte met with the undercover agent and arranged for the sale and delivery of approximately seventeen kilograms of heroin; and finally, on or about November 7, 1982, in the vicinity of 55th Street and 1st Avenue, Manhattan, New York, Abbamonte and DelVecchio possessed approximately nine kilograms of approximately 80% pure heroin.

Thus, the overt acts focused on the disappearance of Solimene who owed money for heroin and the events leading up to two street sales in mid-October and early November of 1982.

During a transaction with Special Agent Francioso, the undercover agent mentioned above, Abbamonte stated that he had three partners: Joseph DelVecchio, "a guy from Brooklyn", and an unknown person whom he did not identify further. Testimony of Agent Snipes, Transcript of July 20, 1985 hearing ("TR") at 53. After his arrest, Lorenzo DiChiara became an informant and identified himself as the guy from Brooklyn and the fourth, unknown person as the "puller" or importer. TR. at 54–56. DiChiara further identified Ambrodia Farino as the "puller" who traveled to Italy to arrange for the importation of heroin. TR. at 56, 57, 76. The only other individual DiChiara identified as involved in this narcotics organization was Lorenzo Scaduti. TR. at 75.

During the investigation which resulted in the information, no evidence or information arose which indicated that Cotroni, Marra, DiGirolamo or Corcione were involved with the specific narcotics organization that included Farino, Abbamonte, DelVecchio, DiChiara and Scaduti. TR. at 57–58.

## C. *Guy A. DiGirolamo*

On June 16, 1983 Guy DiGirolamo was indicted in the District of Connecticut together with his wife and two sons in *United States v. Guy A. DiGirolamo, et al.,* Crim. No. N–83–44, ("prior Connecticut indictment") and charged with conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The conspiracy was alleged to have existed from February 23, 1982 to June 6, 1982 and alleged the distribution of cocaine in Connecticut and elsewhere. Specifically, the indictment charged that:

> It was part of said conspiracy that GUY A DiGIROLAMO, a/k/a "Guy, Sr." and "Toke" would and did supply quantities of cocaine to GAETANO L. DiGIROLAMO, Jr. and MARK DiGIROLAMO for sale and distribution to other persons.

> It was further part of said conspiracy that GUY A. DiGIROLAMO ... and GAETANO L. DiGIROLAMO, Jr. would and did arrange to "front" and distribute quantities of cocaine to other persons.

> It was further part of said conspiracy that GUY A. DiGIROLAMO ..., LUCY DiGIROLAMO, GAETANO L. DiGIROLAMO, Jr. and MARK DiGIROLAMO would and did accept payment for quantities of cocaine "fronted" and distributed to other persons.

On May 14, 1984, DiGirolamo pleaded guilty to the conspiracy charged in the prior indictment.

Court-authorized electronic surveillance was conducted between April 8, 1982 and June 6, 1982 over a telephone at the residence of Guy A. DiGirolamo. The affidavit of Special Agent Paul Salute sought authorization to intercept the communications of Guy A. DiGirolamo, Frank Santo Cotroni, Claude Faber, Richard Goulet, Oreste Abbamonte, Alphonse Sisca, Joseph DelVecchio, Michael Mahigel, Victor Riccatelli, Lucy DiGirolamo, and others then unknown over telephone numbers located at 26 Texas Avenue, Bridgeport, CT. Defendants' Exhibit ("DX") # 501, Initial Application of April 8, 1982. The affidavit alleged that there was probable cause to believe that those named were committing offenses "involving the importation, manufacturing, distributing, and dispensing, and possessing with intent to manufacture, distribute, and dispense a controlled substance, including heroin and cocaine...." DX # 501 ¶ 3(a). Further, Agent Salute averred that the named targets were involved in an unlawful "business enterprise involving controlled substances" in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 960 and 963. DX # 501 ¶ 3(b).

Richard Genova, a Special Agent of the F.B.I., testified that the principal informant, designated CI–1 in the initial electronic surveillance application, at no time provided any information to the effect that Cotroni was involved in any cocaine dealings with Guy DiGirolamo or anyone else. TR. at 6.

## CONCLUSIONS OF LAW

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." Once there has been a conviction for a certain offense, this clause prohibits a second prosecution for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). In light of the perceived ease with which prosecutors can divide a single conspiracy into separate conspiracies by alleging different overt acts, the Court must look to a number of factors to ensure that separate conspiracies, as opposed to a single conspiracy, exist where separate conspiracies are the offenses alleged. *United States v. Papa,* 533 F.2d 815 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *United States v. Mallah,* 503 F.2d 971 (2d Cir.1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

In determining the extent of any identity between purportedly separate conspiracies, the Court may consider (1) the criminal offenses charged in the indictments; (2) the participants of the conspiracies; (3) the dates during which the conspiracies existed or were alleged to have

existed; (4) the methods of operation; (5) the overt acts done in furtherance of the conspiracies; (6) the geographic scope of the conspiracies; (7) the extent to which the purported conspiracies share a common objective; and (8) the degree of interdependence between the purported conspiracies. *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985). The Court may consider the totality of the circumstances. "There is no litmus test for determining whether one conspiracy is part of another conspiracy and ... the answer in each case depends on all of the pertinent circumstances." *United States v. Abbamonte, et al.,* 759 F.2d at 1069.

■ As the Court of Appeals stated in remanding this case, "once a defendant introduces sufficient evidence that the conspiracies alleged were in fact one, the burden shifts to the government to rebut the inference of unity." 759 F.2d at 1069, citing *United States v. Papa,* 533 F.2d at 820–23; *United States v. Bommarito,* 524 F.2d 140 (2d Cir.1975); *United States v. Mallah,* 503 F.2d 971. The government must establish these separate conspiracies by a preponderance of the evidence. *See United States v. Thomas,* 759 F.2d 659 (8th Cir.1985); *United States v. Jabara,* 644 F.2d 574 (6th Cir.1981).

Defendants Abbamonte and DelVecchio argue that the information to which they pleaded guilty was the distribution phase of the overall Canada-Bridgeport-New York conspiracy alleged in the pending indictment. To create the inference of unity Abbamonte and DelVecchio point to the following: (1) both conspiracies involved the distribution of heroin in the New York City area during 1982; (2) the heroin in both conspiracies came from a source in Italy; (3) there was a similarity or overlap of personnel as illustrated by the statements made by the government at sentencing proceedings in the Southern District which showed that DiGirolamo had been involved with Abbamonte and his partners in drug transactions for a long period of time in the New York area, dating as far back as the mid-seventies when Cotroni, Abbamonte, DelVecchio and DiGirolamo were incarcerated together at the Lewisburg Penitentiary; and (4) averments in a wiretap application and in an application for extension of the original wiretap order which indicated a single business enterprise involving the key figures in both conspiracies.

In considering the factors outlined above the Court recognizes a certain amount of overlap between the two conspiracies. For example, the statutory violation charged in the pending indictment is identical to that charged in the information, i.e., conspiracy to distribute and possess with the intent to distribute heroin, a schedule I controlled substance, in violation of 21 U.S.C. § 846. Further, the time period alleged in the pending indictment, April 26, 1982 through May 28, 1982, is completely within the time period alleged in the information, April 1, 1982 through January 7, 1983.

The geographic scope of the two purported conspiracies was also somewhat similar since both involved distribution of narcotics in the New York City area. The pending indictment, however, describes a Canada-Bridgeport-New York City distribution scheme, whereas the information made no reference to any scheme by which heroin was imported from Canada or through Bridgeport to New York and appears to have involved direct importation from Italy to New York. Although there was mention in the wiretap application of Agent Salute during the investigation leading to the pending indictment that Cotroni's heroin was coming from a source in Italy, the government introduced evidence that the heroin which was the subject of the information was imported from Italy by Ambrodia Farino, the "puller", with no evidence that the heroin came into the country from Canada. TR. at 55–56. Although Snipes conceded the possibility that the heroin may have come through Canada, he testified that he never received information to that effect. Thus, although the geographic scope may have been similar since both conspiracies involved the ultimate distribution of narcotics in the New York City

area, the scope of the conspiracy in the pending indictment extended to Canada. Moreover, no connection whatsoever was drawn between Farino and Cotroni as suppliers of heroin from Italy.

 Similarity or identity of time period, offense alleged, and geographic location of the conspiracies is not sufficient indication of a single conspiracy. *United States v. Papa,* 533 F.2d at 821 citing *United States v. Mallah,* 503 F.2d at 983 ("New York City is large enough to harbor two simultaneous narcotics conspiracies ..."). The other factors listed above, then, take on greater significance.

With regard to the similarity of participants in the two conspiracies, Agent Snipes testified that the name "Cotroni" did not surface at all during his investigation of DelVecchio and Abbamonte in connection with the information. Agent Snipes further testified that the names Giovanni or "John" Marra, Michael Corcione and Guy DiGirolamo never surfaced during the course of his investigation which resulted in the Southern District information. TR. at 57–58.[2] Defendants argue that the testimony of Agent Snipes left open the possibility that DiGirolamo and others named in the pending indictment could have been involved in the Abbamonte/DelVecchio organization which he investigated in connection with the information. Defendants draw this conclusion from Snipes' testimony that there could have been other members of the organization which DiChiara, the informant, did not name and that DiChiara never told Snipes that those he did name were the only members of the organization. The Court is not persuaded by this argument, however, in light of Snipes' testimony that the names of the other co-conspirators in the pending indictment never arose in the course of the investigation.

TR. at 57–58. The government is not required here to positively establish that the named co-conspirators in the pending indictment were not involved in any way with the conspiracy alleged in the information, but is rather only required to establish by a preponderance of the evidence that the conspiracy alleged in the pending indictment is a conspiracy separate from the conspiracy to which Abbamonte and DelVecchio pleaded guilty in New York. Thus, on the issue of whether there was an overlap of participants in the two conspiracies, the Court finds that the only clearly established overlap is that of Abbamonte and DelVecchio themselves.

The role of Abbamonte and DelVecchio as New York City distributors in both conspiracies is clear. In the pending indictment they received heroin from Cotroni through DiGirolamo in Bridgeport and in the information they received heroin from Farino and together with DiChiara distributed it in the New York City area. The overlap of two participants, while not insignificant, is not dispositive of the issue of whether two separate conspiracies existed.

The above analysis illustrates what the Court views as different methods of operation in the two conspiracies. The conspiracy alleged in the information involved a scheme by which the narcotics were imported by Farino from Italy for further distribution by Abbamonte, DelVecchio, DiChiara, and Scaduti, whereas the conspiracy alleged in the pending indictment involves a scheme whereby narcotics were imported from Canada, through Bridgeport, for distribution in the New York City area by, among others, Abbamonte and DelVecchio. Additionally, the specific locations for meetings, transfers and collections also differed.

**2.** The Court recognizes the seeming inconsistency between this testimony and the statements made by the government at sentencing and in its sentencing memorandum. The Court addresses the government's statements *infra* at pages 1435–36. On the basis of that discussion, the Court finds that this possible inconsistency is not significant. The issue raised by the pending motions is whether the conspiracies alleged in the pending indictment and in the information constitute separate conspiracies. The government's knowledge of other dealings between Abbamonte and DelVecchio and DiGirolamo which they brought to the sentencing judge's attention at the time of sentencing is not necessarily indicative of a single conspiracy and is outweighed by the other factors which establish separate conspiracies.

The Court also notes that only the first of the sixteen overt acts alleged in the information occurred during the time period covered in the pending indictment. While the Court recognizes that merely alleging different overt acts may be insufficient to establish separate conspiracies, the Court considers it to be one indication here of separate conspiracies.

■ Defendants DelVecchio and Abbamonte point to the transcript of the sentencing proceedings of April 1, 1983. DX # 504, "Sentencing Minutes". During those proceedings, the government contended that the street sales included as overt acts in the information were part of "a whole continuing business." DX # 504 at 39. The government further stated that Abbamonte and DelVecchio were seen with DiGirolamo "on May 4th, on June 14th, and on July 7, 1982, moving around in the area of Pleasant Avenue with packages." DX # 504 at 43. The government also pointed out that it had information which showed that DiGirolamo, Abbamonte and DelVecchio had discussed plans to go into the narcotics business together when they were released from the federal penitentiary in Lewisburg, Pennsylvania. The fact that the government included the above statements in its sentencing memoranda and in its comments during the sentencing proceedings is of no great significance since the prosecutor is not limited in his sentencing comments to the particular crime for which the defendant is about to be sentenced. As the government points out in its Proposed Findings of Fact and Conclusions of Law, such information is permissible so as to enable the sentencing judge to "gain a fuller assessment of the defendant so that the punishment will fit the offender and not merely the crime for which he was convicted." *United States v. Piteo*, 726 F.2d 53, 54 (2d Cir.1984). No double jeopardy issue is created by subsequent prosecution of a crime adverted to in a sentencing proceeding. *Id. Cf. United States v. DeFillipo*, 590 F.2d 1228, 1234 (2d Cir.1979) (admission of prior conspiracy as other crimes evidence raises no presumption of double jeopardy). Moreover, as the government points out, defendant DelVecchio represented in his sentencing memorandum that his involvement was the result of "the long tentacles and temptations of agents and informants who ensnared him ..." rather than any long term involvement in a conspiracy. Government's Exhibit ("GX") # 2 at 5, 9. The informant and agent apparently referred to did not make contact with either DelVecchio or Abbamonte until October, 1982. TR. at 49. Defendant Abbamonte similarly represented that his involvement in the conspiracy charged was limited to the two week period from October 13, 1982 to November 2, 1982. He denied any long term involvement in the conspiracy. GX # 1 at 9. While the comments made by the defendants at sentencing are not determinative, the Court believes that they provide support for the finding of separate conspiracies.

Defendants also rely on the averment in the wiretap applications and affidavits that there was one overall business among all the key figures to deal in both heroin and cocaine. DX # 501, 502. These statements, however, which might appear to indicate that the government believed that all defendants were engaged in an overall conspiracy to distribute both cocaine and heroin, were drafted "during the investigating phase of this matter to comply with the statutory requirements of 18, United States Code, § 2510, *et seq.*, and do not reflect any legal or factual conclusions or judgments beyond those required by the language of said statute." Affidavit of William A. Keefer, June 20, 1985, GX # 3. *See* Government's Proposed Findings of Fact and Conclusions of Law at 9–12. The government describes the paragraphs of the application as purely descriptive in nature and states that they offer no analysis or theory of conspiratorial culpability. While the government was required to list all the potential interceptees or targets of investigation, the government was not required to set forth its theory of culpability as to every target. 18 U.S.C. § 2518(1)(b)(i) and (iv).

Finally, the Court finds no indication of interdependence between the conspiracies. Each conspiracy could have continued completely independently of the other.

■ Thus, although there are, as the Court of Appeals noted, certain factors which point toward one overall conspiracy to deal in both heroin and cocaine, such as the overlap of time and place, and to a certain extent, personnel, the other factors which indicate separate conspiracies, such as different overt acts, a variance in personnel at the important stage of source or importer of narcotics, a lack of interdependence between the conspiracies, and a different method of operation, are of greater significance and require the finding of two separate conspiracies.

With regard to DiGirolamo's double jeopardy claim, after an analysis of all the circumstances and consideration of the eight factors, the Court finds that the prior Connecticut indictment and the pending indictment, both returned by the same grand jury, allege separate conspiracies. The offenses alleged in the two indictments are different. The prior indictment alleges a conspiracy to distribute a Schedule II controlled substance, cocaine, in violation of 21 U.S.C. § 846 and the pending indictment alleges a conspiracy to distribute a Schedule I controlled substance, heroin, in violation of 21 U.S.C. § 846. The time period of the conspiracies overlapped for approximately two months from April 1, 1982 to June 6, 1982. The geographic location of the conspiracy charged in the prior indictment was the District of Connecticut and elsewhere. The government argues that the phrase "and elsewhere" was included for venue purposes and cites *United States v. Sinito*, 723 F.2d 1250, 1258–59 (6th Cir. 1983). Although the Court does not specifically adopt this argument, it notes that the government's anticipated proof at trial did not involve any action occurring outside the District of Connecticut.

The prior indictment did not specifically allege overt acts, but it did allege that as part of the conspiracy (1) Guy DiGirolamo supplied cocaine to Mark DiGirolamo and Gaetano L. DiGirolamo, Jr. (his two sons) for sale and distribution to others; (2) Guy DiGirolamo and his two sons "fronted" and distributed cocaine to others; and (3) Guy DiGirolamo, Lucy DiGirolamo, Gaetano DiGirolamo, Jr. and Mark DiGirolamo accepted payment for cocaine which had been fronted and distributed to others. These allegations are entirely different from the alleged overt acts in the pending indictment described above. *See supra*, at 1431.

The methods of operation were also different in that, in the conspiracy to which DiGirolamo pleaded guilty, members of his family played key roles, whereas there is no evidence that the members of his family played any role in the heroin distribution conspiracy alleged in the pending indictment. Further, the informant designated CI–2 in the April 8, 1982 wiretap application, DX # 501, advised the government that DiGirolamo's cocaine was supplied by persons from one of the New York "families", indicating that Cotroni, in Canada, was not a supplier of DiGirolamo's cocaine. Paragraph 36a of the same affidavit indicates that CI–1 also advised the government that "DiGirolamo continues to travel to New York and Long Island to see "Ernie Boy" Abbamonte, who continues to be DiGirolamo's main source of cocaine." DX # 501. Thus while there was some overlap of personnel, notably Abbamonte, the participants were substantially different in that the cocaine distribution conspiracy primarily involved the members of DiGirolamo's family.

The Court finds further that there was no evidence of interdependence of the conspiracies. While all narcotics distribution conspiracies may be considered to have as an ultimate common objective the distribution of narcotics, there is no evidence that these conspiracies sought the same specific objective.

For the foregoing reasons, the Court finds that the government has put forward sufficient evidence to show by a preponderance of the evidence that the conspiracies alleged in the pending indictment, the Southern District information, and the pri-

or Connecticut indictment constitute separate conspiracies. The motions to dismiss on grounds of double jeopardy are, therefore, DENIED.